UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JENNIFER D., as Parent of Travis D.,

                              :

                Plaintiff,        :          06 CV 15489 (JGK)

                              :          (ECF Case)

       -against-

                              :

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                              :

                Defendant.     :
-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF JENNIFER D.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………1

STATUTORY AND REGULATORY SCHEME…………………………………….…..1

STANDARD OF REVIEW…………………………………………………………………3

FACTUAL SUMMARY………………………………………………………………4

ARGUMENT…………………………………………………………………………..9

I.   THE DOE SHOULD COVER THE COST OF TRAVIS' TUITION AT LEGACY FOR THE 2006-2007 SCHOOL YEAR: THE DOE'S PROPOSED PLACEMENT DID NOT PROVIDE TRAVIS WITH AN APPROPRIATE EDUCATION IN THE LEAST RESTRICTIVE ENVIRONMENT; LEGACY WAS AN APPROPRIATE PLACEMENT; AND EQUITIBLE CONSIDERATIONS SUPPORT PLAINTIFF'S CLAIM.
…………………………………...........................................................................9

       A.  FIRST BURLINGTON FACTOR: THE DOE'S DISTRICT 75 PLACEMENT WAS INAPPROPRIATE FOR TRAVIS………………….........................................................................12

           1.   P370 would not provide Travis with the special education he needed…………………………………………………………12

           2.   At P370, Travis would not be able to interact to the maximum extent appropriate with non-disabled students……………………………………………………..15

       B.  SECOND BURLINGTON FACTOR:  THE LEGACY PROGRAM AT XAVERIAN THAT PLAINTIFF SELECTED WAS APPROPRIATE FOR TRAVIS…………………………………………………………17

       C.  THIRD BURLINGTON FACTOR: EQUITABLE CONSIDERATIONS SUPPORT PLAINTIFF'S CLAIM…………………………………...19

II.   ADDITIONAL EVIDENCE SHOULD BE PERMITTED TO FULLY APPRISE THE COURT OF TRAVIS' CURRENT ACADEMIC STATUS……………………………………………………………..20

CONCLUSION …………………………………………………………………..23

## PRELIMINARY STATEMENT

Plaintiff Jennifer D. ("Plaintiff"), the mother of Travis, a disabled teenager, submits this memorandum of law in support of her motion for summary judgment. In violation of the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400 et seq., and New York State's implementing laws and regulations, New York Education Law §§ 4401 et seq. and 8 NYCRR §§ 200 et seq., Defendant New York City Department of Education ("DOE") proposed that Travis be placed for the 2006-2007 academic year in a school where he would not receive a free appropriate education in the least restrictive environment.

Plaintiff challenged the DOE's proposed placement in an administrative proceeding before an impartial hearing officer, who ruled in her favor. The DOE then appealed that decision to the state review officer, who annulled the hearing officer's decision.

Plaintiff, who unilaterally enrolled Travis in an appropriate private school during the 2006-2007 academic year, now seeks funding from the DOE for that year's tuition, and reversal of the state review officer's decision.

## STATUTORY AND REGULATORY SCHEME

Congress enacted the IDEA to insure that states provide every disabled child between the ages of three and twenty-one with a "free appropriate public education [that] ... meet[s] their unique needs." 20 U.S.C. § 1400(d)(1)(A). Students with disabilities are entitled to receive a free appropriate public education in the least restrictive environment, which means that disabled children should be mainstreamed, educated with non-disabled peers, to the maximum extent appropriate. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114. Depending upon the disabled child's unique needs, the IDEA requires that he or she be offered appropriate alternative

1

placements – "regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions" – along a continuum from least to most restrictive. 34 C.F.R. § 300.115(b)(1). No state can qualify for federal special education funding under the IDEA unless it demonstrates that its disabled children are receiving an appropriate education in the least restrictive environment. 20 U.S.C. §§ 1412(a)(1) and (a)(5). States' departments or boards of education must establish a written Individualized Education Program ("IEP") for every disabled child, 20 U.S.C. § 1414(d)(1)(D)(2)(A), which includes annual goals and short-term objectives to enable disabled children to progress, specifies the special education and/or related services to be provided in furtherance of those goals and objectives, and sets forth the extent to which the child can participate in regular educational programs. 20 U.S.C. § 1414(d)(1)(A).

Pursuant to the IDEA, New York State (the "State") has enacted statutes and regulations that define the rights and obligations, both procedural and substantive, that govern the education of disabled children. See New York Education Law §§ 4401 et seq. and 8 NYCRR §§ 200 et seq. In tracking the IDEA's requirements, the State has made clear that "[a] student with a disability shall be provided with appropriate special education ... necessary to meet the student's unique needs." 8 NYCRR §§ 200.6(a)-200.6(a)(2). Of equal importance, students with disabilities must be educated in the least restrictive environment with non-disabled students to the maximum extent appropriate. 8 NYCRR §§ 200.1(cc), 200.6(a)(1). The full continuum of possible appropriate alternatives – ranging from supplementary services in a general education class to instruction in a hospital – must be provided consistent with a child's needs. 8 NYCRR §§ 200.6(a)(1), 200.6(h). The duty to create an IEP for every disabled child has been delegated to the Committees on Special Education. New York Education Law § 4402(1)(b)(1); 8 NYCRR § 200.4(d)(2). The IEP must specify, inter alia, the child's present levels of performance, disability classification,

measurable annual goals, short-term objectives, the recommended special education program, and an explanation of the extent to which, if any, the child can participate in regular programs. See 8 NYCRR § 200.4(d)(2).

A parent dissatisfied with a proposed IEP may request an impartial due process hearing, 20 U.S.C. § 1415(f)(1)(A), before an impartial hearing officer ("IHO"), New York Education Law § 4404(1), and, in turn, the IHO's decision may be appealed to a state review officer ("SRO"). 20 U.S.C. § 1415(g)(1); New York Education Law § 4404(2). Finally, an aggrieved party has the right to appeal the SRO's decision to a district court. 20 U.S.C. § 1415(i)(2)(A).

"If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private ... secondary school without the consent of or referral by the public agency, a court ... may require the agency to reimburse the parents for the cost of that enrollment if the court ... finds that the agency had not made a free appropriate education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii).

## STANDARD OF REVIEW

On an appeal pursuant to 20 U.S.C. §1415(i)(2)(A), federal courts must take into account the record from the administrative proceeding and any additional evidence presented by the parties, and decide, based on the "preponderance of the evidence," whether the IDEA's provisions have been met. 20 U.S.C. § 1415(i)(2)(C). Courts review the record de novo, giving "due weight" to the administrative proceeding and being "mindful that judges lack the specialized knowledge and experience required to resolve persistent difficult questions of educational policy." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d. Cir. 1998).

However, a court is not required to accord "due weight" when "there are no administrative findings on an issue germane to the court's determination," <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 418 F. Supp.2d 559, 562 (S.D.N.Y. 2006), or when the issue before it is whether a federal statute, such as the least restrictive environment provision of the IDEA, has been properly interpreted.  <u>See</u> <u>Lillbask ex rel. Mauchlaire v. State of Conn. Dept. of Educ.</u>, 397 F.3d 77, 82 (2d Cir. 2005).

## FACTUAL SUMMARY

Travis, who will be fifteen years old on September 29, 2007, is a special education student with a learning disability and an attention deficit hyperactivity disorder ("ADHD"). Transcript ("Tr.") at 101, 102, 117. He is now completing the ninth grade in the Legacy Program ("Legacy") at Xaverian High School ("Xaverian").

Prior to entering Legacy in September 2006, the DOE placed Travis in one special education program after another, with each depriving him of an opportunity to interact with non-disabled students.  As a result, by the time he reached his eighth grade year, Travis had become socially isolated, and had poor self esteem.  His school performance was poor, as was his behavior.  Tr. at 41.

The DOE placed Travis in his first special education program when he was in the first grade and showed signs of developmental delay and ADHD.  Tr. at 30.  For Travis' second and third grade years, the DOE removed him from a community school, which included both disabled and non-disabled children, and transferred him to a special school, called a District 75 school, which was exclusively for disabled students.  Tr. at 35-36.  For the fourth and first half of fifth grades, the DOE again placed Travis in a segregated school, a private school for disabled children called the Lorge School, where Travis had no opportunity to be mainstreamed.  Tr. at 38.

Because Travis was being mistreated by his classmates, he was removed from the Lorge School in the second half of fifth grade. Tr. at 38. However, instead of transferring Travis to a school with mainstream students, the DOE merely offered him home instruction for the remainder of that year. Tr. at 38.

In his sixth grade year, the DOE returned him to a special class with twelve students, one teacher, and one paraprofessional ("12:1:1: class") in a community school. Tr. at 40. Although that placement was in a school where both disabled and non-disabled children attended, Travis still had no opportunity to interact with non-disabled students because the school kept him, as a special education student, separated from the general education population. Tr. at 39-40. In seventh grade, the DOE placed Travis in another 12:1:1 class in yet another community school, I.S. 78, where he fared no better. Tr. at 42-45. Travis' social isolation, frustration, diminishing self esteem, and academic failings continued. His grades particularly suffered, barely passing some subjects and failing others. Tr. at 45.

During the fall of 2005, as an eighth grader at I.S. 78, Travis' behavior at school worsened. See Exhibit 10. By that time, the DOE had classified Travis with "emotional disturbance" as his handicapping condition on his IEP. See Exhibit 7 at p. 1. He exhibited impulsive, disruptive behavior, with frequent outbursts in class. Tr. at 203. In an effort to quell that behavior, in November 2005, the DOE assigned Travis a personal one-to-one aid, called a behavior management paraprofessional ("paraprofessional"). Tr. at 178, 205.

Within a few weeks after the DOE appointment of the paraprofessional, Travis' special education teacher, Mr. Russell Marcus, unconvinced that Travis' behavior was going to improve, filed a written request to review his IEP. See Exhibit 9. The school psychologist, Mr. Edward

Isaacs, responded to that request and scheduled evaluations and an IEP review meeting. Tr. at 172-73.

In preparation for the IEP review meeting, Mr. Isaacs evaluated Travis and prepared two reports, a psycho-social and psycho-educational evaluation. <u>See</u> Exhibits 7 and 8. Mr. Isaacs conducted the IEP review meeting on January 31, 2006 and drafted the IEP, which described Travis as "generally delayed" academically and changed his classification from "emotional disturbance" to "other health impaired."[1] Exhibit 6 at p. 3. By the beginning of February 2006, Travis' behavior had improved significantly because of the assignment of the paraprofessional. <u>See</u> Exhibit G (letters from Mr. Marcus, Mr. Aladino Lopez, and Mr. Isaacs). Notwithstanding Travis' improved behavior and the IEP team's determination that Travis' handicapping condition was no longer "emotional disturbance," Mr. Isaacs, nevertheless, insisted that Travis needed a behavior management program and, on the IEP, recommended that the DOE remove Travis to a District 75 school, a more restrictive environment exclusively for disabled children. <u>See</u> Exhibit 6; Tr. at 180. Mr. Isaacs made this District 75 recommendation because the program was "geared for more behavioral management." As if that was all that mattered, he merely held out the "hope" that Travis would be placed there in a class "conducive to his academic, social and physical well-being." Tr. at 197-98.

Given Travis' inability to succeed in a nonintegrated environment, Plaintiff investigated the availability of a program in which he would have the opportunity to attend a school with mainstream students and professionals familiar with his disability. Tr. at 47-49. Plaintiff had learned of the special education program at Xaverian and believed that that school would give her son an opportunity for an appropriate special education in an integrated setting, which she knew

---

[1] "Other Health Impaired" is the classification for children with ADHD. <u>See</u> 8 NYCRR §200.1(zz)(10).

he needed in order to succeed. Tr. at 50. She and Travis met with the Director of Admissions for Special Education Services at Xaverian, Dr. Carol Trasborg, who considered Travis for admission. Tr. at 96. Dr. Trasborg concluded, after meeting several times with Travis and reviewing his school records, that he should have been classified as "learning disabled." Tr. at 101-102, 117. Dr. Trasborg testified that Travis' poor behavior was not the source, but the consequence of his educational need: "Travis has got learning disabilities, frustrations, some acting out related to his poor achievements in school, and a demonstrated willingness to overcome that [acting out] if given the opportunity to be successful in the classroom…." Tr.101-102. Dr. Trasborg ultimately concluded that he would be a good candidate for Legacy, one of Xaverian's special education programs. Tr. at 103.

Legacy is a private, special education program with a proven track record for college-bound students with learning disabilities, who are capable of being mainstreamed. Tr. at 94. Students in Legacy have the opportunity to mainstream in any area(s) of demonstrated strength. Tr. at 121. In the course of the educational day, special education students receive multiple opportunities to meaningfully interact with mainstream students. For example, Legacy classes are held in the same location as the general education classes. Lunch, homeroom, and gym are integrated, as are all Xaverian extracurricular activities, including music, band, drama, athletics, and academic and cultural clubs. Tr. at 121-22.

Following the DOE's January 31, 2006 decision to remove Travis to a special school environment, it nonetheless kept him in I.S. 78 for the remainder of his eighth grade year. By notice dated May 18, 2006, the DOE notified Plaintiff that, in the fall of 2006, Travis was to begin a behavior management program at P 370, a District 75 school, where once more he would have no exposure to mainstream students. See Exhibit 2. Plaintiff visited the school once by

herself and a second time with Travis.  Tr. at 57-58, 226, 270.  Of the students at P 370, most have an "emotional disturbance" classification and none of the children are non-disabled.  Tr. at 229, 236.  By placing him in P 370, the DOE would have deprived Travis, in his first year of high school, of any opportunity to interact with non-disabled students.  Given Travis' past experiences of not being able to function in a segregated school setting and given Dr. Trasborg's professional judgment that Travis required interaction with non-disabled peers, Plaintiff sought to enroll her son in Legacy, which she believed would finally meet his needs.  See Exhibit B.

Plaintiff filed for an impartial hearing contesting the January 31, 2006 IEP District 75 placement.  See Exhibit 1.  Substantive hearings were held over a two day period on June 9, 2006, and June 15, 2006.  Plaintiff contested the DOE's January 31, 2006 IEP as failing to provide Travis with an appropriate education in the least restrictive environment and requested private school funding for the 2006-2007 school year in Legacy.  The impartial hearing decision ("IH Decision"), filed on July 7, 2006, held that, "based on the evidence from I.S. 78 as well as the testimony of Dr. Trasborg, I find that … the [P370] placement … does not meet the requirement of least restrictive."  IH Decision at 11.  The IH Decision ordered the DOE to provide funding for Travis to attend Legacy for the 2006-2007 school year.  IH Decision at 12.

The DOE appealed the IH Decision to the SRO.  In Plaintiff's Verified Answer, she stated that a primary issue on appeal was the fact that the DOE's P 370 placement would not provide Travis with an education in the least restrictive environment.  See Verified Answer at ¶ 41.  The SRO, failing to even consider that issue, annulled the impartial hearing decision by his decision entered on September 28, 2006 (the "SRO Decision").  Plaintiff now appeals the SRO Decision to this Court.

Almost simultaneously with the SRO Decision, Travis began his 2006-2007 school year at Xaverian where, for the first time since the first grade, he is integrated into the mainstream school environment with non-disabled students. As set forth below, Travis is flourishing in Legacy. See infra at p. 24.

## ARGUMENT

**I. THE DOE SHOULD COVER THE COST OF TRAVIS' TUITION AT LEGACY FOR THE 2006-2007 SCHOOL YEAR: THE DOE'S PROPOSED PLACEMENT DID NOT PROVIDE TRAVIS WITH AN APPROPRIATE EDUCATION IN THE LEAST RESTRICTIVE ENVIRONMENT; LEGACY WAS AN APPROPRIATE PLACEMENT; AND EQUITIBLE CONSIDERATIONS SUPPORT PLAINTIFF'S CLAIM.**

Pursuant to the IDEA, the DOE was required to provide Travis with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"). 20 U.S.C. §§ 1412(a)(1) and (a)(5). Thus, the inquiry before the SRO was twofold: whether P 370, the District 75 school proposed by the DOE, provided Travis with a FAPE, and whether it would, to the maximum extent appropriate, allow Travis to be integrated with non-disabled peers. These are two distinct questions. See L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 393 (3d Cir. 2006). According to the Seventh Circuit, the FAPE and LRE provisions are actually "two sides of the same IEP coin. The first requirement is absolute and focuses on the school district's proposed placement ...; the second is relative and concentrates on other placement options." Beth B. v. Van Clay, 282 F.3d 493, 497 (7th Cir. 2002), cert. denied, 537 U.S. 948 (2002).

However, the SRO's decision contained only an abbreviated discussion of FAPE, and no analysis at all as to whether Travis' proposed placement in a District 75 school met the IDEA's LRE requirement. The SRO erred in ignoring the LRE mandate and, as will be set forth below, in doing so, he erred in concluding that Plaintiff failed to sustain her burden of demonstrating the inappropriateness of the DOE's P 370 placement. See SRO Decision at 8; see infra at pp. 12-17.

In Gagliardo v. Arlington Cent. Sch. Dist., 418 F. Supp.2d 559 (S.D.N.Y. 2006), a case very similar to the one herein, this Court considered both the IDEA's FAPE and LRE requirements in deciding whether the parents of a bright, but depressed and anxious teenager named Stephen were entitled to funding for unilaterally enrolling him in a private school. Both the school district and the parents agreed that Stephen could not be maintained in a public high school. The parents contested the school district's recommended private school, Karafin, arguing that it would not have provided Stephen an appropriate education in the least restrictive environment. Instead, the parents sought tuition funding for their son to attend Oakwood Friends Academy ("Oakwood"), a private school for general education students.

As in all IDEA cases concerning whether a parent is entitled to funding pursuant to unilaterally placing a disabled child in a private school, the Gagliardo Court's decision relied on the factors enumerated by the Supreme Court in School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 370 (1985): (1) were the services proposed by the board of education inappropriate; (2) were the alternative services selected by the parent appropriate; and (3) do equitable considerations support the parent's claim (the "Burlington factors").

For the first Burlington factor, which, in Gagliardo, involved a determination of whether Stephen would receive an appropriate education in an LRE if he attended Karafin, this Court articulated a three-pronged inquiry: (1) would Karafin provide the special education Stephen needed; (2) would Stephen, to the maximum extent appropriate, be able to interact in Karafin with non-disabled peers; and (3) was Karafin as close as possible to Stephen's home. See Gagliardo, 418 F. Supp.2d at 572 (citing 8 NYCRR 200.1(cc)).

In addressing the three prongs of the first Burlington factor, the Gagliardo Court found that Karafin would have offered more individualized instruction than Stephen required and would have done so in a setting with severely learning disabled and/or disruptive students, whereas Stephen was neither. Moreover, Karafin, located a long distance from Stephen's home, would not have provided the academic challenge that he needed nor given him any opportunity at all to interact with non-disabled peers. 418 F. Supp.2d at 573-75. On that basis, the Court concluded that Karafin did not offer Stephen a FAPE in an LRE, and was thus an inappropriate school for him. The parents had satisfied the first Burlington factor. Id. at 575.

As for the second Burlington factor, which considered the appropriateness of Oakwood, the Gagliardo Court focused on the fact that that school would provide Stephen with a supportive environment in which he could excel academically and develop "his impaired social skills." With that, the Court determined that the parents had satisfied the second Burlington factor as well. Id. at 576. Finally, with regard to the third Burlington factor, the Court concluded, primarily on the basis of a long history of cooperation between the parents and the school district, that the parents were equitably entitled to funding for Oakwood. Id. at 576-78. As a result of their having satisfied each of the Burlington factors, the Court granted the parents' motion for summary judgment and the school district was ordered to cover the costs of Stephen's tuition at Oakwood. Id. at 578.

Applying the Gagliardo Court's analysis to the present case, it is evident that Plaintiff is similarly entitled to funding.

**A.  First <u>Burlington</u> factor: The DOE's District 75 Placement Was Inappropriate for Travis.**

In the case herein, the three-pronged inquiry addressing the first <u>Burlington</u> factor involves consideration of: (1) whether P 370 would provide Travis with the special education he needed; (2) whether Travis, to the maximum extent appropriate, would be able to interact in P 370 with non-disabled peers; and (3) whether P 370 was as near as possible to Travis's home.[2]  <u>See</u> <u>id</u>. at 572 (citing 8 NYCRR 200.1(cc)).

### 1.  P 370 would not provide Travis with the special education he needed.

 If Travis had attended P 370, a District 75 school, he would have been placed in a 12:1:1 class with eleven students with "emotional disturbance issues."  Tr. at 217.  In fact, P 370, "a very small site" with less than 225 students, Tr. at 218, 219, has just "two populations," children who are emotionally disturbed and students with autism.  Tr. at  217.  Of the non-autistic students, the majority have the classification "emotional disturbance" on their IEPs, and even students without that classification need "a program that offers a lot of emotional and behavior support."  Tr. at 225.  P 370 has no regular education students.  Tr. at 229; Verified Answer at ¶38.

Unlike the students who would have been his classmates at P 370, Travis is learning disabled with ADHD, not emotionally disturbed.  Dr.  Trasborg, the Admissions Director for Special Education Services at Xaverian, who has a PhD. in Educational Psychology, master's degrees in both special education and counseling, and who taught for twenty-five years, Tr. at 94, testified to this fact.  Tr. at 101-102 ("Travis has got learning disabilities, frustrations, some acting out related to his poor achievements in school, but he has demonstrated a willingness to overcome

---

[2] Plaintiff does not contest the proximity of the DOE's proposed school site on grounds of least restrictive environment.

that if given the opportunity to be successful in the classroom and we felt that Travis was more LD than ED...."), 103, 117 ("[T]here's evidence in the testing that [Travis] has decoding issues. He has concentration issues during reading comprehension, … his math is delayed, particularly problem solving. His listening comprehension is low. All of those are evidence of a learning disability."); IH Decision at 5. According to Dr. Trasborg, Legacy would provide Travis with the assistance a learning disabled student needed, such as teaching math through interactive computer games and improving delayed decoding skills. Tr. at 95; IH Decision at 11.

Indeed, by changing Travis' classification on his January 31, 2006 IEP from "emotional disturbance" to "other health impaired," Exhibit 6, the DOE acknowledged that his primary disability did not involve "emotional disturbance issues."

Documentary evidence in the administrative record demonstrates that, once the paraprofessional assigned to Travis in November 2005 had been with him for a short time, the behavior problems he exhibited during the first two or three months of the school year had abated. For example, in February 2006, approximately three months after Travis was assigned the paraprofessional, Mr. Marcus, Travis' eighth grade teacher, wrote: "Travis ... has been a student in my class since September, 2005. It is with pleasure that I report that he has shown a definite improvement in behavior." Exhibit G; Tr. at 204. This sentiment was echoed by his paraprofessional, Mr. Lopez, who, in a letter dated February 6, 2006, said: "I've been working with Travis a few month's [sic] now, his behavior is improving drastically," Exhibit G, and by the school psychologist, Mr. Isaacs who, on February 9, 2006, wrote: "Travis' current teacher and the classroom paraprofessional have been in constant contact with me and have indicated improved behavior from Travis." Exhibit G.

Travis' improved behavior post-November 2005 is further evidenced by the fact that, on the report card for the first quarter, before the paraprofessional was assigned, his conduct was rated as needing improvement in English, Social Studies and Math, and unsatisfactory in Science, whereas for the second quarter, on a report card dated February 8, 2006, after the paraprofessional had been in place for a few months, his conduct was rated as satisfactory in all subjects except for Math in which he still needed improvement. See Exhibit F; Tr. at 111; Decision at 2, 5; Verified Answer at ¶27. Moreover, while the projected initiation date on the IEP was February 15, 2006, Exhibit 6 at p. 2, which means that Travis could have been transferred to a District 75 school as of that date, the transfer was not to go into effect until September 2006. Tr. at 245-47; Decision at 4; IH Decision at 8, 10. If Travis was indeed a severely disturbed boy who needed a more restrictive placement, the DOE would presumably not be willing to keep him in a community school for an additional four months, from February 15, 2006 to the end of the school year in June 2006. The only reasonable explanation for the delay, which the IHO termed "odd," IH Decision at 10, was that, after the assignment of the paraprofessional, Travis' behavior had improved to the point that the transfer was no longer considered essential.

Based on the three letters, Travis' improved conduct marks and the decision to delay moving him to a more restrictive setting, all of which attest to the beneficial effects of the paraprofessional, it is clear that Travis could have been maintained in the community school.

Just as Stephen, the teenager considered by the Gagliardo Court, would have been placed at Karafin with students with more severe and different disabilities than he himself had, in P 370, Travis, a learning disabled boy with ADHD who could be educated in a community school, would have had classmates who had severe "emotional disturbance issues," and were, unlike him, too

disruptive to remain in a community school.  Karafin's services would not have provided Stephen

with the special education he needed, and there is no evidence in the administrative record that

P 370, with its sole emphasis on dealing with "emotional disturbance issues," could have provided

Travis with the teaching methodologies needed by a learning disabled child with ADHD.

   Plaintiff has met her burden with regard to the fact that P 370 would not provide Travis

with the special education he needed.

### 2.  At P 370, Travis would not be able to interact to the maximum extent appropriate with non-disabled students.

It is well-established that mainstreaming provides disabled children with, <u>inter alia</u>,

"appropriate role models," <u>L.B. v. Nebo Sch. Dist.</u>, 379 F.3d 966, 978 (10th Cir. 2004); "unique

benefits," <u>W.S. ex rel. C.S. v. Rye City Sch. Dist.</u>, 454 F. Supp.2d 134, 148 (S.D.N.Y. 2006); "age

appropriate peer interaction," <u>R.L. v. Plainville Bd. of Educ.</u>, 363 F. Supp.2d 222, 231 (D.Conn.

2005); and an opportunity to "develop[] ... social and communication skills," <u>Warton v. New

Fairfield Bd. of Educ.</u>, 217 F. Supp.2d 261, 275 (D.Conn. 2002).  As the Third Circuit stated,

"Congress understood that a fundamental value of the right to public education for children with

disabilities is the right to associate with nondisabled peers."  <u>Oberti by Oberti v. Board of Educ. of

Borough of Clemonton Sch. Dist.,</u> 995 F.2d 1204, 1216 (3d Cir. 1993); <u>see also</u> <u>Roark ex rel.

Roark v. District of Columbia</u>, 460 F. Supp.2d 32, 43 (D.D.C. 2006) ("mainstreaming of

handicapped children into regular school programs where they might have opportunities to study

and to socialize with nonhandicapped children is not only a laudable goal but is also a

requirement of the [IDEA]") (citation omitted).

The administrative record is replete with evidence that Travis benefited from and needed

social interaction with non-disabled peers who could serve as role models and upon whom he

could pattern his own behavior.  Tr. at 47-49, 79, 80, 85; Verified Answer at ¶17.  As the IHO concluded, Travis needed "the opportunity for modeling on the proper conduct of his peers."  IH Decision at 11.  In fact, she asserted that that such modeling was one of the "biggest features" needed for Travis to succeed.  Id.

P 370, a District 75 school, would not have provided Travis any opportunity whatsoever to interact with non-disabled peers.  While P 370 is allegedly associated with "several inclusion programs in community based high schools," Verified Petition at ¶24, the testimony of Ms. Robin Glaser, the P 370 administrator, showed that the process of being included in such a program would be lengthy and the ultimate inclusion by no means certain: first, the P 370 staff had to "get to know the students and see how they're doing in the program [at P 370,]" then a "recommendation to the school assessment team [could be made] to change their IEP," and, only after there was an evaluation which deemed it appropriate to change the IEP, could a student "attend one of our inclusion programs."  Tr. at 222.

Although the evidence in the record clearly demonstrates that, after the assignment of the paraprofessional, Travis could be integrated in a school that also educated non-disabled students, and indeed would benefit greatly from such interaction, the DOE's proposed District 75 placement would completely preclude him from interacting with those non-disabled peers. Tr. at 229.  On the continuum of alternative placements for disabled children, a District 75 school, which is a "special school," is more restrictive than the "special class" in a community school which Travis was then attending.  See 34 C.F.R. §300.115(b)(1).  According to the IHO, the P370 placement "does not meet the requirement of least restrictive."  IH Decision at 11.

As previously stated, the SRO erred by ignoring the LRE requirement, a crucial aspect of this case.

With regard to the first Burlington factor, Plaintiff has sustained her burden of demonstrating that P 370 was an inappropriate placement for Travis; a District 75 school for teenagers with "emotional disturbance issues" would not have offered Travis an appropriate education in an LRE.  The SRO erred in finding otherwise.

**B.      Second Burlington Factor: The Legacy Program at Xaverian that Plaintiff Selected Was Appropriate for Travis.**

To meet her burden with regard to this issue, Plaintiff must show that her unilateral placement offered Travis an educational program that met his unique needs.  See Gagliardo, 418 F. Supp.2d at 575.  Plaintiff must establish that Legacy was "appropriate," not that it was "perfect," id. at 564, which means that it was "likely to produce progress, not regression." Walczak, 142 F.3d at 130.  The SRO did not address this issue.  See Decision at 8.

Dr. Trasborg described Legacy, with a 15:1 student-teacher ratio, as being an appropriate setting for college-bound learning disabled students.[3]  Tr. at 94.  Those students benefit from the mainstreaming opportunities offered them at Xaverian.  To that end, Legacy students attend homeroom, lunch and gym with regular education peers, have the opportunity to be mainstreamed for particular academic subjects, and "can participate in any and every activity, including sports teams, music, band, drama, academic clubs and cultural clubs that the school offers" to non-disabled students.  Tr. at 121-22; Verified Answer at ¶47.  Plaintiff, who visited Xaverian several times and knew the importance of Travis interacting with non-disabled peers, described the special education students in Legacy as being "mixed with the regular ed. [students]. ... They are not in a basement.  They are not segregated."  Tr. at 63.

---

[3] To work with its disabled students, Xaverian has a special education teacher, a school psychologist and a speech pathologist on staff.  Tr. at 95, 103-104.

Dr. Trasborg unqualifiedly asserted that Travis, whom she met on a number of occasions, and who she thought was a motivated, learning disabled student, Tr. at 114, 117, was an appropriate candidate for Legacy. Tr. at 101-103; IH Decision at 5, 11 ("Dr. Trasborg, an experienced educator, was supremely confident that the program would be able to meet the student's needs in a 15:1 class."); Verified Answer at ¶49 (Dr. Trasborg "believes that the methods of instruction at Xaverian will address Travis' delays in decoding and math, that academic success will increase his self-esteem and that motivation is key to his success."). The IHO, the person who heard the testimony of all the witnesses, clearly indicated that Dr. Trasberg was particularly credible and knowledgeable. For example, the IHO stated that, "based on … the testimony of Dr. Trasborg I find that … [the P 370] recommendation does not meet the requirement of least restrictive." IH Decision at 11. Like Dr. Trasborg, Mr. Marcus, Travis' eighth grade teacher and the person who the IHO believed knew him best of all the professionals who testified, IH Decision at 10, asserted that Travis could be maintained in the 15:1 program in a "strict environment." Tr. at 210 ("If the structure is based on consequences and they have a strict environment, then I believe Travis could be educated in an environment like [a 15:1 program]"); IH Decision at 6, 10.

As could have been anticipated, Dr. Trasborg's assessment, based on her intimate knowledge of Legacy – its students, teachers, goals, teaching methodology, etc. – was accurate. Since enrolling in Legacy in September 2006, Travis has not only remained a student there,[4] but he has done well academically and socially and emotionally. He is a respected member of the Xaverian community. See Declaration of Sherry Drazner ("Drazner Dec."); Declaration of Frank DeLassio ("DeLassio Dec."); Declaration of John Joseph Jordan ("Jordan Dec.").

_____

[4] The DOE predicted that Travis would be expelled from Xaverian because of his behavior problems. Tr. at 273.

18

In fact, relying only on Dr. Trasborg's expert testimony and that of Mr. Marcus, Plaintiff has established that Legacy was an appropriate placement for Travis, one in which it was "likely" that he would progress, not regress.  See Walczak, 142 F.3d at 130.  Thus, Plaintiff has satisfied the second Burlington factor.

### C.    Third Burlington Factor: Equitable Considerations Support Plaintiff's Claim.

"The third and final Burlington factor is equitable entitlement to reimbursement." Gagliardo, 418 F. Supp.2d at 576.  That inquiry focuses on whether the parent cooperated with the school district before and after the disputed IEP was written.  Id. at 577.  It is those parents "who refuse to cooperate with their local CSE [who] equitably forfeit their claim for tuition reimbursement."  Carmel Central Sch. Dist. v. V.P. ex rel. G.P., 373 F. Supp.2d 402, 417 (S.D.N.Y. 2005).  As was the case with regard to the second Burlington factor, the appropriateness of Legacy, the SRO did not address this issue.

From the first grade, when Travis became a special education student, through the eighth grade, he attended five schools, including public, private, community and District 75 schools.  Tr. at 32-44; Verified Petition at ¶6.  During that eight year period, Plaintiff acceded to each one of the DOE's changing recommendations concerning where Travis should be placed.  As it happened, each year or every other year, Travis had to change schools and/or programs to go along with the DOE's newest recommendation.  Plaintiff continued to cooperate with the DOE even after the January 31, 2006 IEP recommended that Travis be placed in a District 75 school. Tr. at 56, 179; Exhibit 6.  For example, she visited P 370 twice, once alone and once with Travis. Tr. at 57-58, 226, 270.  In addition, she visited two State approved, private schools, Bishop Ford, which did not have a seat available for her son, and Martin De Porres, Tr. at 138-141, which was

not appropriate for Travis, and called several others, including Summit and Churchill, none of which had seats left for September 2006.  Tr. at 141-42; Verified Answer at ¶43.

Plaintiff's cooperative relationship with the DOE is very similar to the relationship the parents in Gagliardo had with the school district.  In that case, this Court concluded that the parents were equitably entitled to the funding sought.  418 F. Supp.2d at 577.

Likewise, Plaintiff is equitably entitled to funding for Travis' appropriate placement in Legacy during the 2006-2007 academic year.

## II.  ADDITIONAL EVIDENCE SHOULD BE PERMITTED TO FULLY APPRISE THE COURT OF TRAVIS' CURRENT ACADEMIC STATUS.

The IDEA specifically allows a court to consider additional evidence in IDEA appeals. Under 20 U.S.C. § 1415(i)(2)(C)(ii), parties are allowed to present additional evidence to the court on judicial review:

> In any action brought under this paragraph the court (i) shall receive the record of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.(Emphasis added).

20 U.S.C. § 1415(i)(2)(C)(i) - (iii) (emphasis added).

For guidance in construing the "additional evidence" clause, courts have turned to the First Circuit case, Town of Burlington v. Department of Educ., 736 F.2d 773 (1st Cir. 1984), aff'd on other grounds, 471 U.S. 359 (1985), as the seminal case with regard to construction of subsection § 1415 (i)(2)(C)(ii).  The court in Town of Burlington expressly warned against "unduly limit[ing] a court's discretion and constrict[ing] its ability to form the independent judgment Congress expressly directed," and set out criteria for determining circumstances justifying admission of "additional evidence."  Id. at  790.  That court enumerated certain factors that would warrant admission of additional or supplemental evidence:

The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, <u>and evidence concerning relevant events occurring subsequent to the administrative hearing</u>.

<u>Id</u>. (emphasis added).

Prevailing Second Circuit law holds that district courts possess discretion to permit additional evidence under the IDEA where it will aid the determination of what constitutes an LRE placement.  <u>See</u> <u>Frank G. v. Board of Educ. of Hyde Park</u>, 459 F.3d 356, 366 (2d Cir. 2006) (In affirming the district court's decision to admit additional evidence of a student's social and academic progress, the Court stated: "[The district court judge] … was able to rely on evidence that was not available to the SRO to conclude that [the disabled student] … had made significant progress.").

Second Circuit district courts specifically refer to the <u>Town of Burlington</u> analysis in determining the court's scope of discretion.  <u>See</u> <u>Mavis v. Sobol</u>, 839 F. Supp.968, 978-981 (N.D.N.Y. 1993); <u>A.S. v. Trumbull</u>, 359 F.Supp.2d 102, 103-104 (D.Conn. 2005).

Other Second Circuit cases, while not explicitly citing <u>Town of Burlington</u>, recognize the court's clear authority to consider material outside the administrative record and specifically evidence of events occurring after the administrative hearing process was over.  In <u>Warton</u>, the court freely allowed evidence from both parties of a child's subsequent performance to determine whether the child was placed in an LRE.  According to the court, "Plaintiff's evidence of his subsequent success in the mainstream program with appropriate supports is relevant to this consideration."  <u>Warton</u>, 217 F. Supp.2d at 276.  Like the evidence sought to be introduced in this case, the plaintiff in <u>Warton</u> offered evidence of "his teacher evaluations replete with praise of his academic and social success in the mainstream classroom with appropriate supports and aids,

[which] underlines that plaintiff benefitted in this placement beyond expectations set by the School Board or by the hearing officer." Id. The court concluded that this evidence would prove especially pertinent to its determination because it "underscores the merit and prescience of … [two experts'] recommendations that plaintiff would benefit from meaningful contact with his mainstream peers." Id. at 278.

Similarly, in Gagliardo, the Court allowed additional evidence of a child's academic success which occurred after the administrative hearing process was over to determine the appropriateness of the parents' proposed placement. As the Court stated, "Stephen's success at Oakwood is, of course, not a basis for concluding that the district's proposed placement was not calculated to provide him with a FAPE. However, it is some evidence about the propriety of the parents' unilateral placement." Gagliardo, 418 F. Supp.2d at 570, n.2.

In this case, Plaintiff offers additional evidence which provides this Court with relevant, objective, newly available evidence, which demonstrates Travis' success in the Legacy Program during the 2006-2007 school year. That evidence constitutes valid supplemental evidence and, moreover, falls squarely within the Town of Burlington's permissible category because it documents "events which occurred subsequent to the administrative hearing." This Court has ample authority to consider this evidence, which validates Dr. Trasborg's testimony during the administrative proceeding that, indeed, Travis would succeed in Legacy.

Plaintiff, therefore, offers three declarations from Legacy personnel: Travis' counselor, global studies teacher, and life science teacher. See Drazner Dec.; DeLassio Dec.; Jordan Dec. Those declarations establish that Travis has performed well at Legacy. Travis' counselor and teachers attribute his academic and social progress to a mainstreaming model in which younger Legacy students, like Travis, interact with non-disabled Xaverian students throughout the school

day to prepare them for eventual integration into the general education curriculum.  DeLassio Dec. at ¶¶ 9, 10; Drazner Dec. at ¶¶12, 16; Jordan Dec. at ¶10.  Travis' school counselor, Ms. Drazner, recognizes that Travis "needs to be involved in an integrated school setting where he can learn and socialize with non-disabled children."  Drazner Dec. at ¶16.  At Xaverian, Travis has not only learned to control his impulsivity, but has developed social skills necessary to navigate a mainstream environment and has made school friends with disabled and non-disabled students.  Drazner Dec. at ¶¶ 10, 11, 16, 17; Jordan Dec. at ¶6; DeLassio Dec. at ¶8.  According to Travis' global studies teacher, Mr. Jordan, "Travis definitely benefits by exposure to Xaverian's non-disabled student population.  He very much wants to belong and be accepted, and the realization that he can do as well as others, has contributed immeasurably to his self-esteem and awareness that he is on the right track.  Travis is proud and happy to be at Xaverian."  Jordan Dec. at ¶10.  Noting his success, Travis' counselor, Ms. Drazner, reports that Travis is on track to be mainstreamed into the general education curriculum, graduate with a Regent's diploma, and ultimately matriculate into college.  Drazner Dec. at ¶¶8 and 19.  Indeed, Travis is a "perfect fit" for Legacy.  Drazner Dec. at  ¶19.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that her motion for summary judgment be granted, the SRO's decision be reversed, and the DOE be ordered to fund the cost of Travis' placement during the 2006-2007 school year in Xaverian High School's Legacy Program.

Dated: New York, New York
      May 10, 2007

Respectfully submitted,

/s

_____

YIROEL SCHULMAN (YS 3107)
NEW YORK LEGAL ASSISTANCE GROUP
Laura Davis, Of Counsel (LD 8226)
Sandra L. Weinglass, Of Counsel (SW 8646)
450 West 33rd Street, Floor 11
New York, New York 10001
(212) 613-5000

Attorneys for Plaintiff