**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────

JENNIFER D., as Parent of Travis D.,

                     **Plaintiff,**           06 Civ. 15489 (JGK)

       - against -                **OPINION AND ORDER**

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                     **Defendant.**
────────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Jennifer D., brings this action on behalf of
her son Travis D. ("Travis") pursuant to the Individuals with
Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 et
seq., against the New York City Department of Education (the
"DOE").  The plaintiff is appealing from an order of the State
Review Officer ("SRO"), that declined to award her tuition
reimbursement for her unilateral placement of Travis in the
Legacy Program at Xaverian High School (the "Legacy Program")
for the 2006-07 school year.  The SRO's decision reversed the
decision of an Impartial Hearing Officer ("IHO") who had granted
reimbursement to the plaintiff.  The parties have cross-moved
for summary judgment.  The Court has subject matter jurisdiction
pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2)(A).

Under the IDEA, "states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Centr. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) [hereinafter Gagliardo II] (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). A free appropriate public education must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'" Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (internal quotation marks and citation omitted)). Because the IDEA expresses a "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Id. (internal citation omitted); see also Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 379 (2d. Cir. 2003).

These services are administered through a written individualized education program ("IEP"), which must be updated at least annually. Walczak, 142 F.3d at 122; see also 20 U.S.C.

§ 1414(d).  In New York, the responsibility for developing

appropriate IEPs has been assigned to local Committees on

Special Education ('CSE').  Id. at 123.  "In developing a

particular child's IEP, a CSE is required to consider four

factors: (1) academic achievement and learning characteristics,

(2) social development, (3) physical development, and (4)

managerial or behavioral needs."  Gagliardo II, 489 F.3d at 107-

08 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs.

[hereinafter "N.Y.C.C.R.R."] tit. 8, § 200.1(ww)(3)(i)).

Parents in New York who wish to challenge the IEP as

insufficient under the IDEA may request an impartial due process

hearing before an IHO appointed by the local board of education.

Id. (citing 20 U.S.C. § 1415(f) and N.Y. Educ. Law § 4404(1)).

A party may appeal the decision of the IHO to an SRO, and the

SRO's decision may be challenged in either state or federal

court.  Id. (citing 20 U.S.C. § 1415(g), 1415(i)(2)(A) and N.Y.

Educ. Law 4404(2)).


II

The administrative record and the additional evidence

submitted by the plaintiff reveal the following factual and

procedural background.[1]

---

[1] A district court reviewing administrative decisions under the IDEA should consider the administrative record as well as any "additional evidence at the request of a party."  20 U.S.C. § 1415(i)(2)(C)(ii).

Travis D. ("Travis") has been classified as a student with a disability in need of special education services since he was in first grade.  Travis was born three months premature and was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) at about four years of age.[2]  He was later evaluated by the DOE and was reportedly found to have developmental delays.

Prior to the school year in question, Travis attended community schools, a special education school, and a state-approved non-public school.  He was also home schooled for one semester.  The record reflects that Travis experienced behavioral difficulties at all of these placements.  For his sixth grade year Travis was placed in a special class in a community school, Hudde Junior High School, where he came in first in the science fair and his self-esteem improved.  Travis attended a different community school, Roy H. Mann Junior High School ("IS 78"), for seventh and eighth grades, after the plaintiff asked the CSE to move Travis to a school where he could participate in gym and other school activities and not be educated in the basement.  Travis was placed in a 12:1:1 class with twelve students, one teacher, and one paraprofessional.

---

[2] Travis has reportedly also been diagnosed with Oppositional Defiant Disorder ("ODD"), Tourette's Syndrome, and Asberger's Syndrome, although the plaintiff asserts that the Asberger's diagnosis was mistakenly made when Travis was six years old and was removed from his IEP two years later, and that the Tourette's diagnosis was mistakenly made based on side effects of medication prescribed for Travis's ADHD.  In any event, the only medical conditions reflected on Travis's January 31, 2006 IEP are ADHD and allergies.  (Def.'s Ex. 6 at 1.)

Travis reportedly struggled academically and socially during his first year at IS 78.

In 2005-06, Travis was in eighth grade and was again placed in a special education class with a 12:1:1 staffing ratio at IS 78. At the time he was classified as "Emotionally Disturbed" and was provided speech therapy and counseling. He displayed poor behavior at the beginning of his eighth grade school year at IS 78. His special education teacher, Russell Markus, documented numerous behavioral incidents from September 9, 2005 through December 1, 2005, including disrupting class, the use of foul and other inappropriate language, and other inappropriate behavior. (Def.'s Ex. 10.)[3] In November 2005, Travis was assigned a 1:1 behavior paraprofessional.

On or about December 1, 2005, just a few weeks after the assignment of the paraprofessional, Mr. Markus submitted a Type 3 Recommendation, which is a referral to the School Based Support Team to reevaluate Travis's IEP.[4] The Type 3 Recommendation stated that Travis's behavior had deteriorated to the point where it was interfering with instruction and that Travis lacked respect for authority. (Def.'s Ex. 9.) On Travis's first quarter report card, his conduct was rated as

---

[3] Citations to exhibits refer to those documents submitted by the parties to the IHO and reviewed by the SRO.
[4] The plaintiff testified that Travis's IEP was reevaluated as a result of a letter she wrote in November 2005 rather than the Type 3 Recommendation submitted by Mr. Markus. (Hr'g Tr. 76-77.)

needing improvement in English, Social Studies, and Math, and as unsatisfactory in Science (Pl.'s Ex. F.). The comments indicated that Travis did not show self-control, did not stay on task, and included a request for a parent-teacher conference. (Hr'g Tr. 111.)

Travis's behavior improved notably during the second quarter of the school year following the assignment of the paraprofessional.[5] In particular, Mr. Markus noted a lessening in impulsivity and outbursts. This improvement in behavior is reflected in Travis's second quarter report card, issued in February 2006, where his conduct was rated as satisfactory in English, Social Studies, and Science, and needing improvement in Math. (Pl.'s Ex. F). Furthermore, while the comments section of the report card indicates that Travis remained "[f]ar below standards" academically in English and Math, other comments reflect that he was "[p]repared for class" in English and was "[a]pproaching standards" with satisfactory effort in Social Studies. (Id.) Travis's improved conduct is also reflected in letters submitted by the plaintiff from Mr. Markus, Edward Isaacs, the school psychologist at IS 78, and Aladino Lopez, the

---

[5] The parties' dispute whether Travis's improvement in behavior was sustained through the end of the 2005-06 school year. However, the parties agree that in determining whether the IEP was appropriate, the Court should consider the evidence that was available to the CSE at the time the January 31, 2006 IEP was developed. (See Pl.'s letters dated March 11, 2008 and March 13, 2008; Def.'s letters dated March 11, 2008 and March 13, 2008.) Therefore, in deciding whether the IEP was appropriate, the Court has not considered testimony relating to Travis's behavior beyond the second quarter of the 2005-06 school year.

paraprofessional assigned to Travis in November 2005. (Pl.'s Ex. G). Mr. Markus reported "a definite improvement in behavior" and the paraprofessional reported that Travis's "behavior is improving dramatically." (Id.)

In connection with the reevaluation of Travis's IEP, Mr. Isaacs performed a social history and psychoeducational evaluation on January 12, 2006. (Def.'s Exs. 7, 8.) The resulting report described Travis as highly impulsive, socially immature, and extremely disruptive in class, and noted that he had difficulty obeying school rules and authority figures. (Def.'s Ex. 7 at 1, Ex. 8 at 1-4.) Mr. Isaac's found Travis to be generally delayed academically, and noted that Travis did very little class work or homework, and that his cognitive skills were in the Low Average Range (Def.'s Ex. 8 at 2, 4.)

The CSE convened on January 31, 2006 to review Travis's IEP. The CSE team was duly constituted and was attended by the plaintiff, a representative of the school district, a general education teacher, a special education teacher, a school psychologist, a parent member, and a counselor. At that meeting, a new IEP was developed for Travis (the "IEP"). (Def.'s Ex. 6.) The IEP changed Travis's classification from "Emotionally Disturbed" to "Other Health Impairment," and recommended that Travis be placed in a 12:1:1 special class in a specialized school attended only by disabled students (a

"District 75 school"). (Id. at 2.)  It also included related
service recommendations for once weekly individual counseling,
once weekly group counseling, twice weekly group speech language
therapy, and an individual behavior management paraprofessional
for 100 minutes per day.  (Id. at 10.)  The IEP indicated that
Travis's individual speech therapy and 1:1 paraprofessional were
to be terminated.  (Id. at 2.)  The IEP noted that Travis's
academics were generally delayed, that his behavior seriously
interfered with classroom instruction and required additional
adult support, and recommended a small class environment to
address his social, emotional, and behavioral problems.  (Id. at
3-4.)  The IEP also included annual goals and short-term
objectives, including that Travis would control his impulsivity
and develop self control.  (Id. at 6.)

     In the winter of 2005, Travis expressed interest in
attending Xaverian, which he had learned about from teammates on
his ice hockey team.  (Hr'g Tr. 46.)  After learning that
Xaverian had a special education program, the plaintiff met with
Dr. Carol Trasborg, Xaverian's Director of Admissions for
Special Education, about the Ryken Education Center at Xaverian
(the "Ryken Center").  The Ryken Center is a 12:1:1 program
designed for students with multiple special education needs as a
result of, among other things, speech impairments, Asberger's
Syndrome, processing issues, or learning disabilities.

Dr. Trasborg said that she would consider admitting Travis to the Ryken Center if his grades and conduct improved.  In February of 2006, the plaintiff met with Dorene Willis, a secretary for the Region 6 CSE whose work includes assisting with nonpublic school referrals, about her desire to place Travis in Ryken.  Ms. Willis consulted with her superiors about the plaintiff's financial situation and subsequently the district issued a "Nickerson letter" to the plaintiff to cover the funding of a private school.[6]  (Def.'s Ex. 3.)  Ms. Willis also contacted the Ryken Center to confirm its interest in accepting Travis.  There is some dispute in the record as to whether the plaintiff was provided with a list of state-approved programs at this time or during the resolution session, which was held in May 2006.  (Hr'g Tr. 15; Def.'s Ex. 5.)

Due to health problems, the plaintiff did not deliver Travis's second quarter report card to Dr. Trasborg for several weeks.  By this time, there were no available seats in the Ryken Center.  Based on his second quarter report card, the letters reflecting Travis's improved behavior, and her interactions with Travis, Dr. Trasborg offered Travis a seat in the Legacy Program, the other special education program offered by

---

[6] A Nickerson letter is a letter issued by the DOE that authorizes the parent of a disabled child to place the child in an appropriate special education program in a state-approved private school at public expense.  See A.T. v. New York State Educ. Dep't, No. 98 CV 4166, 1998 WL 765371, at *1 n.2 (E.D.N.Y. Aug.4, 1998) (citing Jose P. v. Ambach, 669 F.2d 865 (2d Cir. 1982)); see also SRO decision at 9 n.2.

Xaverian. The Legacy Program is a 15:1 program designed for college-bound learning disabled students with other minor emotional issues. The students are mainstreamed for lunch, gym, and homeroom, and are taught by the same teachers as the regular high school classes. The plaintiff was unable to use the Nickerson letter issued by the district to fund the tuition for the Legacy Program, because the Legacy Program is not a state-approved program. (Hr'g Tr. 107.)

On May 18, 2006, the defendant issued a Final Notice of Recommendation ("FNR"), offering a placement to Travis in a 12:1:1 class at Jim Thorpe High School ("PS 370"), a District 75 school, for the 2006-07 school year. (Def.'s Ex. 2.) The FNR also included the individual and group counseling services recommended in the January 31, 2006 IEP. PS 370 is a special high school geared to students with emotional disturbance issues and has no general education students. Each class has a paraprofessional along with a crisis intervention teacher and a full staff of related service providers. The school uses a behavior modification program called the "Power of Choice," where students earn points for good behavior. The school offers inclusion programs at community high schools for students who demonstrate a sustained change in behavior sufficient to warrant a modification to their IEP. (Hr'g Tr. 220-22.) Also on May 18, 2006, Travis's parents completed a registration form for

Xaverian and the plaintiff entered into a contract with Xaverian
for Travis's enrollment in the Legacy Program for the 2006-07
school year.  (Pl.'s Exs. B, C.)

The plaintiff submitted an amended request for an impartial
hearing dated May 25, 2006, in which she challenged the IEP's
recommended placement of Travis in a District 75 school and a
12:1:1 staffing ratio.[7] (Pl.'s Ex. E.)

At the hearing before the IHO, the plaintiff called five
witnesses and introduced seven documents.  The defendant called
three witnesses and introduced ten documents.  The IHO issued a
twelve-page opinion in which she granted the plaintiff's request
for reimbursement.  The IHO found that the plaintiff carried her
burden to show that the IEP was inappropriate on the grounds
that the placement recommendation did not meet the IDEA's
requirement that Travis be educated in the least restrictive
environment.  (IHO decision at 11.)  The IHO also found that the
plaintiff established that the unilateral placement in the
Legacy Program was likely to confer educational benefit and was
therefore appropriate.[8]  (Id.)  Lastly, the IHO found that

---

[7] The plaintiff initially requested a due process hearing challenging the IEP
on April 28, 2006.  In her request, the plaintiff indicated she wished "to
appeal from the failure of [the CSE] to approve [Travis's] attendance at The
Legacy Program in Xaverian High School." (Def.'s Ex. 1.)  On the first day
of the impartial hearing, the IHO stated that she could not order the
student's placement at a program that was not approved by the state, and
granted the plaintiff's request to amend her hearing request to seek the cost
of Travis's tuition pursuant to Burlington.  (Hr'g Tr. 11-12.)
[8] The defendant argues that the IHO's determination that the placement was
appropriate was impermissibly based on the availability of ice hockey at

equitable considerations did not weigh against reimbursement. (Id. at 12.)

The defendant appealed from the decision of the IHO to a SRO. The SRO sustained the defendant's appeal on the grounds that the plaintiff had failed to establish by a preponderance of the evidence that the IEP's proposed placement of Travis was inappropriate. (SRO decision at 8.) In particular, the SRO found:

> the plaintiff has failed to allege or prove that [the] recommended program was not designed to confer educational benefit. [The plaintiff's] testimony at the impartial hearing suggesting that the student tends to imitate the behavior of those around him, that he would not be motivated in a District 75 school like P.S. 370, and that he had been picked on in previous specialized school placements, was insufficient to establish . . . that [the] recommended program was inadequate to meet the student's special education needs.

(Id. (record citations omitted).) The SRO did not make any findings with respect to whether the plaintiff's placement of Travis in the Legacy Program at Xaverian was appropriate or whether equitable considerations weighed against reimbursement for the plaintiff.

---

Xaverian. As addressed later in this Opinion, the Court agrees with the defendant that the availability of ice hockey is not a relevant consideration under the IDEA. However, the IHO's decision also includes a detailed discussion of the testimony of Dr. Isaacs, Mr. Markus, and Dr. Trasborg in reaching its conclusion that the Legacy Program was likely to provide educational benefit to Travis. As explained below, the plaintiff has carried her burden to prove that the placement in the Legacy Program at Xaverian was appropriate based on permissible considerations.

Following the decision by the SRO, the plaintiff filed this reimbursement action pursuant to 20 U.S.C. 1415(i)(2).  The plaintiff has submitted three affidavits from educational professionals at Xaverian as additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii).[9]  Sherry Drazner, school psychologist in the Legacy Program and Travis's counselor, states that Travis's focus, impulse control, and self-esteem improved during his ninth grade year in the Legacy Program.  Reports of Travis's misbehavior ceased after the first few months and Travis is expected to graduate with a Regent's diploma and go on to college if he desires.  (Drazner Aff. ¶ 15.)  John Joseph Jordan, Travis's Global Studies Instructor, attests to Travis's improved behavior and academic success, estimates Travis's grade average at approximately 80 and expects that Travis could be mainstreamed in history by junior year if not sooner.  (Jordan Aff. ¶¶ 6, 8.)  The plaintiff also submits the affidavit of Travis's Life Science instructor, Frank DeLassio, who states that Travis's behavior was not problematic after an initial adjustment period, and that Travis completes his homework assignments on time and participates meaningfully in class.

---

[9] Additional evidence submitted pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) may include "evidence concerning relevant events occurring subsequent to the administrative hearing."  Town of Burlington v. Dep't of Educ., 736 F.2d 773, 790 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985).  Evidence of the student's progress at the unilateral placement is relevant to the determination of whether the parents' unilateral placement was appropriate.  See Gagliardo II, 489 F.3d at 115; Frank G. v. Bd. of Educ., 459 F.3d 356, 366-67 (2d Cir. 2006).

(DeLassio Aff. ¶¶ 8-9.)  Both Mr. Jordan and Mr. DeLassio

highlight test taking as one area where Travis has room to

improve. (Jordan Aff. ¶ 8, DeLassio Aff. ¶ 7).

III

Parents who believe that their child's IEP fails to meet

the requirements of the IDEA may, at their own financial risk,

enroll the child in a private school and seek retroactive

reimbursement of tuition from the state.  See Sch. Comm. of

Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985).  The

Supreme Court has established a two-part test to determine

whether a party is entitled to reimbursement: "(1) was the IEP

proposed by the school district inappropriate; [and] (2) was the

private placement appropriate to the child's needs." Gagliardo

II, 489 F.3d at 111-12 (citing Burlington, 471 U.S. at 370).

The burden rests with the party seeking relief, which in this

case is the plaintiff.  See Schaffer v. Weast, 546 U.S. 49, 56

(2005).  If the two-part Burlington test is satisfied, the Court

has discretion to consider relevant equitable factors in

fashioning relief.  Gagliardo II, 489 F.3d at 112 (citing

Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 16

(1993)).

Under the IDEA, a district court independently reviews the

administrative record, along with any additional evidence

presented by the parties, and must determine by a preponderance
of the evidence whether the IDEA's provisions have been met.[10]
Grim, 346 F.3d at 380; see also Mrs. B. v. Milford Bd. of Educ.,
103 F.3d 1114, 1120 (2d Cir. 1997). This independent review,
however, is not "an invitation to the courts to substitute their
own notions of sound educational policy for those of the school
authorities which they review." Rowley, 458 U.S. at 206. The
Court of Appeals for the Second Circuit has explained that
"federal courts reviewing administrative decisions must give
'due weight' to these proceedings, mindful that the judiciary
generally 'lack[s] the specialized knowledge and experience
necessary to resolve persistent difficult questions of
educational policy.'" Gagliardo II, 489 F.3d at 113 (quoting
Rowley, 458 U.S. at 206); see also Cerra v. Pawling Cent. Sch.
Dist., 427 F.3d 186, 191 (2d Cir. 2005). Deference to the
decision in the administrative record is particularly
appropriate when the administrative officers' review has been
thorough and careful, and when the Court's decision is based
solely on the administrative record. See Walczak, 142 F.3d at
129; Frank G. v. Bd. of Educ., 459 F.3d 356, 367 (2d Cir. 2006).

---

[10] Courts have noted that "[s]ummary judgment appears to be the most pragmatic
procedural mechanism in the Federal Rules for resolving IDEA actions," but
that "[t]he inquiry . . . is not directed to discerning whether there are
disputed issues of fact, but rather, whether the administrative record,
together with any additional evidence, establishes that there has been
compliance with IDEA's processes and that the child's educational needs have
been appropriately addressed." Wall v. Mattituck-Cutchogue Sch. Dist., 945
F.Supp. 501, 508 (E.D.N.Y. 1996); see also Antonaccio v. Bd. of Educ. of
Arlington Centr. Sch. Dist., 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).

Where the findings of the IHO and SRO conflict, the findings of
the IHO may be afforded diminished weight.  See Gagliardo II,
489 F.3d 113 n.2 (citing Karl v. Bd. of Educ., 736 F.2d 873, 877
(2d Cir. 1984) and Heather S. v State, 125 F.3d 1045, 1053 (7th
Cir. 1997)).

A

        In deciding whether the challenged IEP satisfies the
requirements of the IDEA, two issues are relevant: (1) whether
the state complied with the procedural requirements of the
statute, and (2) whether the challenged IEP was "reasonably
calculated to enable the child to receive educational benefits."
Rowley, 458 U.S. at 206-07.  In this case, the plaintiff does
not allege a failure to comply with IDEA's procedural
requirements.  Rather, the plaintiff challenges the IEP on the
substantive grounds that it did not provide Travis with a free
appropriate public education in the least restrictive
environment.

        With respect to the sufficiency of the IEP, the reviewing
court "must examine the record for 'objective evidence' that
indicates 'whether the child is likely to make progress or
regress under the proposed plan.'"  Gagliardo II, 489 F.3d at
113 (quoting Walczak, 142 F.3d at 130).  The parties agree that
in determining whether the IEP placement was inappropriate, the

Court should consider the evidence relevant to establish the state of facts as they existed at the time the challenged IEP was developed, namely, January 31, 2006.

The Court of Appeals for the Second Circuit has not articulated a separate test to be used to evaluate whether an IEP complies with the mainstreaming requirement of the IDEA. Other Courts of Appeals have noted that the two-part test established in Rowley is not directly aimed at resolving the question of whether the IDEA's mainstreaming requirement has been satisfied.  See Mavis v. Sobol, 839 F. Supp. 968, 982 (N.D.N.Y. 1994) (collecting cases from the Third, Fifth, Eighth, and Eleventh Circuits).[11]  In response, other Courts of Appeals have fashioned separate tests to be used in cases where the challenge to the IEP is that it fails to satisfy the Least Restrictive Environment ("LRE") requirement and have suggested a non-exhaustive list of factors which are relevant to the determination of whether a particular IEP mainstreams a disabled

_____

[11] For example, in Roncker v. Walter, 700 F.2d 1058 (6th Cir. 1983), the Court of Appeals for the Sixth Circuit stated:

> [T]his case involves the mainstreaming provision of the Act while *Rowley* involved a choice between two methods for educating a deaf student. In the latter case, the dispute is simply one of methodology and the Supreme Court has emphatically stated that such questions should be left to the states. In the present case, the question is not one of methodology but rather involves a determination of whether the school district has satisfied the Act's requirement that handicapped children be educated alongside non-handicapped children to the maximum extent appropriate. . . . Since Congress has decided that mainstreaming is appropriate, the states must accept that decision if they desire federal funds.

700 F.2d at 1062 (internal citation omitted).

child to the maximum extent appropriate given his needs.[12] See generally P. ex rel. Mr. P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89, 101-102 & n.2-n.5 (D. Conn. 2007). These cases emphasize that the mainstreaming requirement is a separate substantive standard under the IDEA. See, e.g., id. at 100 ("[I]n addition to the [Free Appropriate Public Education ("FAPE)] requirement, the Act also requires that the education of disabled children take place in the least restrictive environment (LRE).").

It is unnecessary to adopt a separate test in connection with the mainstreaming requirement in this case. The Court of Appeals for the Second Circuit has not specifically addressed the issue or adopted a separate test. Id. at 101. Under Rowley, this Court is required to engage in an analysis of whether the IEP satisfies the substantive standards of the IDEA. The Court in Rowley noted that the IDEA "requires participating States to educate handicapped children with nonhandicapped

[12] In Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036 (5th Cir. 1989), the Court of Appeals for the Fifth Circuit set out a two-part test and provided a non-exhaustive list of factors relevant to the mainstreaming issue. Daniel R.R., 974 F.2d at 1048-49. It appears that this test has been adopted by the Third and Eleventh Circuits. See, e.g., Oberti v. Bd. of Educ. of the Borough of Clementon, 995 F.2d 1204, 1215 (3d Cir. 1993); Greer v. Rome City School District, 950 F.2d 688, 696-97 (11th Cir. 1991). The Daniel R.R./Oberti test was more recently approved and adopted by three cases in the District of Connecticut, and one in the Northern District of New York. P. ex rel. Mr. P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89, 101 (D. Conn. 2007); A.S. ex rel. S. v. Norwalk Bd. of Educ., 183 F. Supp. 2d 534, 540-41 (D. Conn. 2002); Warton v. New Fairfield Bd. of Educ., 217 F. Supp. 2d 261, 273-78 (D. Conn. 2002); Mavis, 839 F. Supp. 968. Other Circuit Courts employ the test developed by the Sixth Circuit in Roncker. The Ninth Circuit has adopted a four-factor balancing test. Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1404 (9th Cir. 1994).

children whenever possible." <u>Rowley</u>, 458 U.S. at 202.  The

Court of Appeals for the Second Circuit has explained that the

IDEA expresses a "strong preference for children with

disabilities to be educated 'to the maximum extent appropriate,'

together with their non-disabled peers, special education and

related services must be provided in the least restrictive

setting consistent with a child's needs."  <u>Walczak</u>, 142 F.3d at

122 (internal citation omitted).  The case law, in conjunction

with the relevant provisions of the IDEA and the federal and

state regulations promulgated thereunder, provide sufficient

guidance to determine whether the LRE requirement has been

satisfied without recourse to a separate test.

The IDEA requires states to establish procedures to assure

that,

> [t]o the maximum extent appropriate, children with
> disabilities, . . . are educated with children who are not
> disabled, and special classes, separate schooling, or other
> removal of children with disabilities from the regular
> educational environment occurs only when the nature or
> severity of the disability of a child is such that
> education in regular classes with the use of supplementary
> aids and services cannot be achieved satisfactorily."  20
> U.S.C. § 1412(a)(5)(A).

This requirement is embodied in both federal and state

regulations.  <u>See</u> N.Y.C.C.R.R. tit. 8, § 200.1(cc); 34 C.F.R §§

300.114-300.118.   Under the New York regulations:

> [t]he placement of an individual student with a disability
> in the least restrictive environment shall: (1) provide the
> special education needed by the student; (2) provide for

education of the student to the maximum extent appropriate
to the needs of the student with other students who do not
have disabilities; and (3) be as close as possible to the
student's home.

N.Y.C.C.R.R. tit. 8, § 200.1(cc). Whether the IEP was
appropriate in this case turns on whether placement in a
District 75 school satisfied this requirement.

As an initial matter, a review of the administrative record
reveals that the SRO did not make any specific findings with
respect to whether the IEP and subsequent final placement
afforded Travis an education in the "least restrictive
environment." The SRO found that the plaintiff failed to
sustain her burden of demonstrating the inappropriateness of the
IEP on the grounds that the plaintiff "failed to allege or prove
that petitioner's recommended program was not designed to confer
educational benefit." (SRO decision at 8.) The SRO went on to
find that the plaintiff's evidence was "insufficient to
establish by a preponderance of the evidence that [the IEP] was
inadequate to meet the student's special education needs."
(Id.) It is plain that this analysis did not address the LRE
requirement, but instead focused on the requirement that the IEP
provide a free appropriate public education.

The defendant argues that the SRO mentioned this
requirement when it set out the relevant standards and therefore
made an implicit finding that the LRE requirement was satisfied

when it found that the plaintiff had failed to establish that
the IEP was inappropriate.  However, even if such an implicit
finding could be gleaned from the decision of the SRO, it is
undisputed that the SRO's decision does not enumerate the
relevant factors or engage in an analysis of whether the IEP
provided for a placement in the least restrictive environment.
Because the SRO did not make any findings on this issue, the
decision of the SRO is not entitled to deference with respect to
whether the recommended placement in a special school with a
12:1:1 staffing ratio, and the subsequent offer of placement at
PS 370 satisfied this requirement.  Gagliardo v. Arlington Cent.
Sch. Dist., 418 F. Supp. 2d 559, 562 ("[W]here there are no
administrative findings on an issue germane to the court's
determination, deference would be inappropriate."), rev'd on
other grounds, 489 F.3d 105.

      In contrast, the IHO specifically found that "based on the
evidence . . . without exploring further the opportunity of
maintaining the student in a community school, the placement
recommendation does not meet the requirement of least
restrictive."  (IHO decision at 11.)  The Court agrees with the
IHO that in view of Travis's improved behavior following the
assignment of a paraprofessional in November 2005, the plaintiff
has carried her burden to establish that the 12:1:1 placement in
a District 75 school did not satisfy the least restrictive

environment requirement under the IDEA.  Mr. Markus, Travis's teacher who had submitted the Type 3 Recommendation, testified before the IHO that Travis's behavior had improved and indeed he believed that Travis could be educated in a structured 15:1 environment based on consequences, which is a significantly less restrictive environment than the IEP's recommendation that Travis be placed in a 12:1:1 class in a special school.  (Hr'g Tr. 203-04, 210-11.)  Travis's improved behavior was also supported by his second quarter report card, issued shortly after January 31, 2006, and based on conduct in the relevant period, which reflected substantial progress.  Dr. Trasborg also testified that she believed Travis could succeed in the less restrictive environment of the 15:1 Legacy class at Xaverian, based in part on Travis's improvement between December 2005 and February 2006 as reflected in his report card.  (Hr'g Tr. 102-03, 108-09, 114, 119-121.)

Travis's improved behavior in the period from November 2005 through the development of the January 2006 IEP strongly supports the conclusion that he was capable of being educated in a community school, a less restrictive environment than a District 75 school, if he was afforded special education services.  Cf. Warton v. New Fairfield Bd. of Educ., 217 F. Supp. 2d 261, 277 (D. Conn. 2002) (finding the mainstreaming requirement was not satisfied when, among other things, the

record did not support the conclusion that the student "would present [behavioral] difficulties if provided with an adequate level of supplementary aids and related services.")  The IHO's finding that the IEP failed to reflect that Travis could have been maintained in a less restrictive environment with the provision of supplementary aids, related services, and a detailed behavior plan is supported by the record.  See A.S. ex rel. S. v. Norwalk Bd. of Educ., 183 F. Supp. 2d 534, 542-45 (D. Conn. 2002).

This conclusion is strengthened by the fact that the Nickerson letter issued to the plaintiff included less restrictive environments than PS 370, including the Ryken Center at Xaverian.  Dorene Willis testified at the IHO hearing that when a Nickerson letter is issued, the parent is provided with "a list of schools . . . that matches the child's disability." (Hr'g Tr. 244).  While there is some dispute as to when the plaintiff was provided with this list, there is no question that the Ryken Center was included on the list along with other schools that had a general education population.  And while it appears that the Ryken Center does not accept Nickerson letters, the record indicates that at the DOE issued the Nickerson letter to the plaintiff so that she could place Travis in the Ryken Center.  (Hr'g Tr. 240.)

In the Ryken Center, Travis would have been taught in a self-contained class for only disabled children, but would have done so in a school attended by both disabled and non-disabled students. This environment would have been similarly restrictive to Travis's placement at IS 78, and certainly less restrictive than the placement at a District 75 school. See 34 C.F.R. 300.115(b)(1) (a special class in a community school is less restrictive than a school exclusively for disabled students). The appropriateness of the IEP placement is therefore undermined by its subsequent issuance of a Nickerson letter to the plaintiff along with a list of state-approved programs, some of which were less restrictive than the IEP's recommended placement.

The testimony of the defendant's witnesses is less persuasive on the issue of least restrictive environment. The defendant relies mostly on the testimony of Mr. Isaacs and his reports following the social history and psychoeducational assessments he conducted on January 12, 2006. At the hearing, Mr. Isaacs testified that a community school setting was not appropriate for Travis due to his social, emotional, and behavioral difficulties.[13]  (Hr'g Tr. 180-181, 199.)  Mr. Markus

---

[13] In response, the plaintiff points to Mr. Isaacs letter which states, in reference to the Ryken Center, which is less restrictive than District 75 placement, that "it would seem that [the Ryken Center] would address Travis's needs." (Pl.'s Ex. G.)  Mr. Isaacs also testified at the impartial hearing that he wrote the letter solely to appease the plaintiff after repeated

testified to Travis's behavioral problems at the beginning of
the year leading up to his submission of the Type 3
Recommendation to reevaluate the IEP.  However, Mr. Markus also
testified, as noted above, that Travis's behavior had "come a
long way" following the assignment of his paraprofessional, and
that he believed that in the right program Travis could be
educated in a setting less restrictive than 12:1:1.  (Hr'g Tr.
203-204, 210-211.)  Mr. Markus also drafted a letter in February
attesting to Travis's improved behavior, which echoed similar
letters written by Mr. Isaacs and Mr. Lopez.  (Pl.'s Ex. G.)
Finally, Robin Glaser, administrative coordinator at PS 370,
testified that PS 370 could meet Travis's academic and
behavioral needs.  However, her testimony does not address
whether PS 370 was the least restrictive environment appropriate
for Travis's needs.  She did testify that she did not believe
that a 15:1 environment would be appropriate for Travis.
However, she did not testify with respect to whether Travis
could be maintained in a less restrictive environment than PS
370, such as a special class in a community school.  (Hr'g Tr.
225-26.)  Furthermore, her testimony was based on her review of
the IEP, the January 12 psychoeducational assessment, and some
of the anecdotals recorded by Mr. Markus through December 1,

requests and purposefully drafted it in vague terms.  (Hr'g Tr. 183-184, 190-
191).

2005, and does not address the relevance of Travis's second quarter report card or the letters submitted by the plaintiff with respect to the LRE determination.  (Hr'g Tr. 223-25.)

In sum, the objective evidence establishes by a preponderance of the evidence that the IEP was inappropriate because it failed to mainstream Travis to the maximum extent appropriate, and therefore failed to meet the IDEA's requirement that a disabled student's free appropriate public education be provided in the least restrictive environment.  The IEP provided for a 12:1:1 class in a special school.  It did not provide, for example, for Travis to be educated in a special class in a community school.  The primary proffered basis for removing Travis to a special school is that Travis' behavior disrupted the classroom and negatively impacted his academics.  While Travis admittedly had behavioral problems at the beginning of the 2005-06 school year, these problems were substantially lessened in the period between the assignment of his paraprofessional and the reevaluation of his IEP.  This and the other evidence in the record discussed above demonstrates that Travis did not need to be removed from the community school environment because he was capable of being educated in a school that also educated non-disabled students.  See also Walczak, 142 F.3d at 122 ("Only when the nature and severity of a child's disability is such that education in regular classes with the

use of supplementary aids and services cannot be achieved satisfactorily should a child be segregated." (internal quotation marks omitted)).  The IEP placement failed to account for the fact that Travis's improved behavior indicated that a placement in a special school, segregated from his non-disabled peers, would not provide Travis with a free appropriate public education in the least restrictive environment consistent with his needs.

B

The plaintiff bears the burden to prove not only that the IEP was inappropriate, but also that the unilateral private placement was appropriate.  Gagliardo II, 489 F.3d at 112 (citing M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 104 (2d Cir. 2000)).  In determining whether parents have met this burden, the considerations are similar to those employed in determining whether the school district's placement was appropriate.  Frank G., 459 F.3d at 364.  While evidence of a student's success at the unilateral placement is relevant to the court's review, such evidence is not sufficient by itself to establish that the placement was appropriate.  Gagliardo II, 489 F.3d at 115 (citing Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir. 2003) and Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 26-27 (1st Cir. 2002)).  Courts consider the

"totality of the circumstances" and parents "need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." Frank G., 459 F.3d at 364-65 (internal quotation marks omitted).

The plaintiff has satisfied her burden of showing that Travis's placement in the Legacy Program was appropriate. The IHO noted that "[a]n appropriate placement must be able to address the student's ADHD and moderate academic delays, especially in decoding, and also his low self-esteem and poor impulse control . . . ." (IHO decision at 9.) Therefore, in order to satisfy the second prong of the Burlington analysis, there must be objective evidence that the Legacy Program was specifically designed to meet these needs.

First, the plaintiff has submitted evidence that Travis has progressed substantially following his placement in the Legacy Program. As discussed above, the affidavits submitted by the educational professionals at Xaverian, which were not part of the administrative record, contain numerous statements attesting to Travis's academic, behavioral, and emotional progress during his ninth grade year.

While evidence of Travis's progress is not sufficient by itself, there is additional objective evidence that the Legacy

Program was an appropriate placement for Travis. Dr. Trasborg
testified that based on Travis's improved conduct reflected on
his second quarter report card and the motivation he displayed
in her interactions with him, she believed that the Legacy
Program was designed to meet Travis's academic and behavioral
needs. (Hr'g Tr. 98-99, 100, 101-103, 113-114.) She testified
that the 15:1 classes in the Legacy Program are "very
structured" and that Travis would be provided with all of the
services mandated on his IEP, with assessments and modifications
as required for his disabilities. (Hr'g Tr. 95, 103.)

At the hearing, Mr. Markus testified that "[i]f the
structure is based on consequences and they have a strict
environment then I believe Travis could be educated in [a 15:1
environment]." (Hr'g Tr. 210.) Mr. Markus explained that,
depending on the particular program, a 15:1 environment could
potentially meet Travis's needs because Travis's difficulties in
his placement at IS 78 had "more to do with the environment and
the culture of the school than it does the culture of the
specific classroom." (Id. at 210-211.) As the IHO noted, Mr.
Markus had the opportunity to interact with Travis on a daily
basis, unlike the other professional witnesses at the hearing,
and therefore would have particular insight into the type of
program appropriate for Travis. Lastly, Ms. Drazner states in
her affidavit that the students in the Legacy Program have

similar emotional and behavioral issues as Travis and that Travis is not significantly more or less disabled. (Drazner Aff. ¶ 14.) Mr. Markus' testimony and Ms. Drazner's affidavit provide persuasive evidence that the Legacy Program provided Travis with support and services that were specially designed to meet his needs.

In response, the defendant proffers the testimony of Mr. Isaacs who testified that he did not believe that Travis could function in a 15:1 environment because he required additional adult supervision as a result of his behavioral problems and emotional problems, which predominated over his academic difficulties. (Hr'g Tr. 185-186.) The defendant also points to Mr. Isaac's psychoeducational assessment and Travis's history of behavioral problems at prior placements. Ms. Glaser also testified that she thought a 15:1 class may not be sufficiently supportive, but as noted above it appears that she based this opinion on Mr. Markus' anecdotals reporting Travis's behavior through December 1, 2005, prior to Travis's behavioral improvement. (Hr'g Tr. 225-26.)

Reviewing the record as a whole, the plaintiff has carried her burden to establish that the Legacy Program was specially designed to meet Travis's needs because it provided a sufficiently structured environment with specific services mandated in his IEP to address Travis's learning disabilities

and behavioral problems. <u>Frank G.</u>, 459 F.3d at 367 ("[The

student's] progress, viewed together with . . . the program

offered at [the unilateral placement], is sufficient to support"

the determination that the unilateral placement was

appropriate.) The Court has considered Mr. Isaac's contrary

opinion, but finds that the preponderance of the evidence

supports the determination that the Legacy Program was

appropriate. The cases cited by the defendant merely restate

the principle that evidence of progress, standing alone, is not

sufficient to establish that the unilateral placement was

appropriate.[14] <u>See, e.g.</u>, <u>Gagliardo II</u>, 489 F.3d at 115; <u>Thies

v. New York City Bd. of Educ.</u>, No. 07 Civ. 2000, 2008 WL 344728,

at *3 (S.D.N.Y. Feb. 4, 2008). However, as discussed above, the

plaintiff relies not only on the evidence of Travis's progress,

---

[14] The defendant relies heavily on the recent decision in <u>Gagliardo II</u> in
support of its argument that the plaintiff's placement was not appropriate.
In <u>Gagliardo II</u>, the Court of Appeals for the Second Circuit reversed the
district court's judgment that had granted reimbursement, finding that the
district court erred in concluding that the unilateral placement at issue was
appropriate. However, in that case the court was addressing an
administrative record where "the IHO, confronted with the same evidence,
found that [the unilateral placement] was not an appropriate placement," and
the SRO had affirmed the IHO decision. <u>Gagliargo II</u>, 489 F.3d at 113. The
court found that the district court had improperly afforded the IHO's
findings no weight, particularly in light of the fact that the SRO noted that
the IHO's findings were supported by the record. <u>Id.</u> at 114 n.2. The court
found that the IHO's finding was reasoned and supported by the record and
therefore reversed the district court's judgment ordering reimbursement. <u>Id.</u>
at 114. In contrast, in this case the IHO found that the unilateral
placement was appropriate, and the SRO made no findings on this issue. This
Court has given due weight to the findings of the state administrative
officers, and based on its review of the record agrees with the determination
of the IHO that the placement in the Legacy Program was appropriate.
Therefore, unlike in <u>Gagliardo II</u>, this Court does not reach a different
conclusion from the state administrative officers on the issue of whether the
private placement was appropriate.

which is substantial, but also on the testimony of several special education professionals that the Legacy program was designed to meet Travis's particular needs.

The IHO did express some reservation about the 15:1 staffing ratio of the Legacy Program, but nevertheless determined that it was appropriate. (IHO decision at 11.) The Court has given due weight to the findings of the IHO, and agrees with its determination that the unilateral placement satisfies the requirements under the IDEA.

Lastly, the defendant's attempt to defeat the plaintiff's claim by asserting that the motive behind the placement at Xaverian was due to the availability of ice hockey is without merit. The availability of ice hockey at PS 370 or Xaverian is not a relevant consideration in this case. The defendant is correct that "courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not." Gagliardo II, 489 F.3d at 115; see also Thies, 2008 WL 344728, at *3. However, as outlined above, the Legacy Program was an appropriate placement because it was specially designed to meet Travis's needs, irrespective of his ability to participate in ice hockey while attending Xaverian. The defendant cites to no cases in support of the proposition

that a plaintiff should be denied reimbursement for an otherwise
appropriate placement due to the fact that the placement also
afforded the student additional benefits beyond those required
by the IDEA.  The Court has not considered the availability of
ice hockey in its determination of whether the IEP placement was
inappropriate or whether the placement in the Legacy Program was
appropriate under the IDEA.[15]

C

The Court agrees with the findings of the IHO that the
equitable considerations do not weigh against tuition
reimbursement in this case.[16]  The IEP was developed on January
31, 2006.  The plaintiff cooperated with the defendant both
prior to and during the development of the challenged IEP.  It
appears that the plaintiff was ill during February and into
March.  (Hr'g Tr. 52-53.)  Once she was informed that the Ryken
Center was fully enrolled, she began to pursue a seat for Travis
in the Legacy Program.  She received the FNR on May 18, 2006.
The FNR stated that the recommended changes to the IEP would be
made if the plaintiff did not contact Ms. Willis by June 2,
2006.  (Def.'s Ex. 2.)  It went on to state: "If you request

---

[15] While there are federal regulations with respect to the provision of
nonacademic and extracurricular services to disabled children, see, e.g., 34
C.F.R. §§ 300.107, 300.117, the plaintiff has not challenged the January 31,
2006 IEP on this basis.
[16] As noted above, the SRO did not make any findings with respect to equitable
considerations.

a[n] . . . Impartial Hearing before this date the recommended
changes will not be put into effect. . . ." (Id.)  Therefore,
it appears that the plaintiff's request for an impartial
hearing, which was initially made at the end of April, was
timely.  In light of this evidence, the period of time between
the development of the IEP and the request for the impartial
hearing is not so significant as to warrant denial of
reimbursement, particularly in light of the plaintiff's
historical cooperation with the CSE in Travis's placements.

The defendant also points to the fact that the plaintiff
entered into a contract with Xaverian on the same day the FNR
was issued.  However, this does not provide a persuasive reason
to deny reimbursement. The IEP was developed at the end of
January, 2006, and the plaintiff worked with the CSE to find an
alternative placement for Travis prior to entering into a
contract with Xaverian.  There is evidence in the record that
the plaintiff visited PS 370 on two occasions, visited at least
one of the other schools on the state-approved list, and
inquired into the availability of several others.

Finally, the defendant argues that the IHO improperly
allowed the plaintiff to amend the hearing request on the first
day of the hearing, and that this improper amendment is an
equitable factor weighing against reimbursement.  However,
whether the IHO was correct to allow the amendment is not

34

relevant to the determination of whether the plaintiff acted

reasonably, which is the determination the Court must make in

connection with the equitable consideration prong. <u>See</u> <u>Frank</u>

<u>G.</u>, 459 F.3d at 363-64.[17]   Moreover, the SRO did not rely on a

finding of improper amendment.   In sum, the defendant's

assertions do not suggest that the plaintiff acted with the

requisite level of unreasonableness or misconduct such that

reimbursement should be denied on equitable grounds.


CONCLUSION

The Court has considered all of the arguments raised by the

parties.   To the extent not specifically addressed above, the

arguments are either moot or without merit.   For the reasons

discussed above, the DOE's motion for summary judgment (Docket

No. 13) is **denied** and the plaintiff's motion for summary

judgment (Docket No. 10) is **granted.**   The defendant is ordered

to reimburse the plaintiff for the cost of Travis's tuition for

his ninth grade year in the Legacy Program at Xaverian.   The

---

[17] The relevant statute states that "[a] party may amend its due process
complaint notice" if "the hearing officer grants permission, except that the
hearing officer may only grant such permission at any time not later than 5
days before a due process hearing occurs."   20 U.S.C. § 1415(c)(2)(E).   The
first day of the hearing was May 24, 2006.   On that date, the IHO granted
leave to amend.   The plaintiff sent her amended hearing request on May 25,
2006.   The hearing was adjourned until June 9, 2006, more than five days
after the amendment.   Therefore, it would be inequitable to rely on the IHO's
decision to grant leave to amend in view of the ample time the defendant had
to prepare for the hearing after the amendment.

Clerk of the Court is directed to enter judgment for the
plaintiff and to close this case.

SO ORDERED.

Dated: New York, New York
       March 31, 2008

                                    John G. Koeltl
                           United States District Judge